IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-CR-70 |
| | ) | |
| MARIA IGNACIA RAVELO-RODRIGUEZ, | ) | (PHILLIPS/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This case is before the Court on the Defendant's Motion to Suppress

Evidence [Doc. 26], filed on August 25, 2011. The Government responded [Doc. 35] in opposition

to the motion on September 8, 2011. The Court held an evidentiary hearing on October 5, 2011.

Assistant United States Attorney Zachary C. Bolitho represented the Government. Attorney Randall

E. Reagan appeared on behalf of the Defendant, who was also present. The Government presented

the testimony of Special Agent Ted Francisco and Officer Jonathan Barnes, both from the Knoxville

office of United States Immigration and Customs Enforcement ("ICE").[1] The parties also presented

oral argument on the issues. At the conclusion of the hearing, the Court granted the Defendant's

request for leave to file a post-hearing brief. The Defendant filed his post-hearing brief [Doc. 51]

---

[1]ICE is a federal law enforcement agency under the umbrella of the United States
Department of Homeland Security ("DHS"). The two largest facets of ICE are Homeland
Security Investigations ("HSI") and Enforcement & Removal Operations ("ERO").

on November 4, 2011. The Government filed its post-hearing brief [Doc. 52] on that same date. The Court took the motion, response, testimony, post-hearing briefs, and oral arguments under advisement.

## I. POSITIONS OF THE PARTIES

The Defendant is charged in a single-count Indictment [Doc. 3] with being found present in the United States on or about May 17, 2011, having been deported previously after incurring a conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b)(2). The Defendant argues that any evidence discovered and statements she allegedly made should be suppressed because she was illegally seized and arrested without a warrant in violation of 8 U.S.C. § 1357(a)(2) and her Fourth Amendment rights. The Defendant also contends that she was not properly advised of her Miranda rights prior having made an allegedly inculpatory statement in response to interrogation at her home.

The Government responds that the officers had probable cause to arrest the Defendant and that she was properly arrested in a public place. The Government also asserts that the Defendant voluntarily waived her Miranda rights and that all biographical information provided by the Defendant prior to and after having been advised of her rights is not suppressible.

## II. SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

### (A) Testimony of Special Agent Ted Francisco

The Government called Special Agent Ted Francisco, who testified that he works as a criminal investigator for the Homeland Security Investigations ("HSI") component of ICE,

investigating criminal activity with a nexus to the border. On May 17, 2011, Agent Francisco was assisting the Enforcement & Removal Operations ("ERO") division of the Knoxville ICE office with their administrative removal duties, as he occasionally does. In assisting ERO, Agent Francisco went to the residences that ERO officers had identified in their efforts to remove illegal immigrants from the United States, and attempted to obtain information about automobile license tags and/or vehicles as a "pre-operation type surveillance" [Doc. 45 at 7]. Agent Francisco's understanding was that the individuals sought in the operation were sought for administrative removal from the country, rather than for criminal proceedings.

On May 17, 2011, at some time between 6:15 a.m., and 7:00 a.m., Agent Francisco drove by 1618 Folsom Drive, Knoxville, Tennessee, and ran checks on the license tags of several vehicles parked in the driveway. Five or six officers were present at the scene. One of the vehicle tags checked by Agent Francisco was registered to the Defendant, and Agent Francisco informed the case agent in charge of the operation. Agent Francisco knew from documents previously provided to him that the Defendant had previously been ordered deported from the United States and that she had earlier drug charges. The purpose of the officers having gone to the Defendant's home was to take her to the ICE office for processing for administrative removal. None of the officers were armed with long guns, and they did not have raid gear or a battering ram with them.

When Agent Francisco and the other officers arrived at the house, Agent Francisco went to the door on the side of the house and walked up the steps toward the door, but the top of the stairs was "barricaded," and a dog on the other side of the "barricade" "was quite agitated that" the officers were there [Doc. 45 at 10]. Agent Francisco testified that an ERO officer knocked on the side door several times and that the blinds were moving inside, with a person looking through them. Agent

3

Francisco related that the officers had not seen anyone specific at that point but that they were aware that someone was inside the home.

After no one answered their repeated knocks at the door, the officers backed up to the edge of the yard to decide what to do next. The officers determined that the ERO officers would depart and head to a different location to seek out another person for administrative removal, while Agent Francisco and another HSI agent would stay at the present location and conduct surveillance in case the Defendant left her home. After the other officers left, Agent Francisco positioned himself approximately 200 yards from the house in his truck, in a location where he had a line of sight to the house.

While Agent Francisco waited in his truck, another automobile pulled in front of the truck "and a black male in the vehicle sort of shrugged his shoulders, made a gesture as, you know, what are you doing" [Doc. 45 at 11]. When Agent Francisco did not move, the man got out of his car and approached Agent Francisco's truck on the driver's side. Agent Francisco testified that he rolled down his window and informed the man that he was a federal agent and stated that he "was working with a task force and [the task force] had located a stolen vehicle that [they] had been looking for on an adjacent block and that [they] were waiting for the vehicle to move" [Id. at 12]. The agent testified that he lied about what he was doing because he did not know who the man was. Agent Francisco testified that he did not want the man to know that they were conducting surveillance of the Defendant's house, because he did not know if the man knew the Defendant, and the Defendant may have attempted to flee. The man indicated that he was concerned about what Agent Francisco was doing because he had daughters that lived close by, and Agent Francisco informed him that he would leave as soon as they located the vehicle they sought. The man left Agent Francisco and

4

turned to the left, out of the agent's view.

Agent Francisco called the other agent and apprised him of the situation with the man with whom he had just spoken, and the other agent told him the man's car had just passed by him. The other agent informed Agent Francisco that he had a case folder with information about the Defendant given to him by ERO and that when he was looking through the folder, he found a photograph and that the man with whom Agent Francisco had spoken matched the description of a person connected to the Defendant. The agents decided to approach and speak with the man, as he had already approached Agent Francisco and knew that the agents were in the neighborhood. At that point, the same man exited his car, and the agents went toward the house where the man was. The man's father came out of the house, and after Agent Francisco asked the man who he was, he told the agents that he was the Defendant's ex-husband and the father of her children. At some point, the agents identified the man as Mr. Kincaid. Mr. Kincaid's house, where the agents approached him, is approximately 100 to 150 feet away from the Defendant's house, on the opposite side of the street.

Agent Francisco testified that Mr. Kincaid told him that he knew that the agent was in the neighborhood for a different reason that the one he stated. Agent Francisco then confirmed that the agents were present to apprehend the Defendant and that they had paperwork with them to take her to their office to verify her immigration status. Agent Francisco told Mr. Kincaid that "[t]he best thing would be for her to go ahead and come out and that that'd be the easiest way to go about this," as the agents planned to watch the house until the Defendant exited [Doc. 45 at 19]. At that point, Mr. Kincaid called the Defendant on the telephone and explained the situation to her. Mr. Kincaid also told the Defendant "that it would be best if she would go ahead and surrender herself to [the agents]" [Id.]. Agent Francisco testified that Mr. Kincaid related that the Defendant did not want

to be arrested in front of her children. Agent Francisco told Mr. Kincaid that the agents understood and would work around that.

Mr. Kincaid's father informed the agents that he was the legal guardian of the children. The agents walked down toward the Defendant's home, and Mr. Kincaid telephoned the Defendant and informed her that the agents were outside. The children exited the house and walked back to the Kincaids' house with Mr. Kincaid's father. The Defendant then came out of her house, and Agent Francisco testified that he "confirmed her identity" [Doc. 45 at 20]. Agent Francisco stated that he "asked her if that's who she was," and "[s]he said yes" [Id.]. Agent Francisco informed the Defendant that he was placing her under arrest and that he was going to take her to his office to ask her some questions about her immigration status.

Agent Francisco testified that the arrest of the Defendant was an administrative arrest and that as an ICE agent, he is authorized to make warrantless administrative arrests of people he has probable cause to believe are illegal aliens and that he does so in the regular course of his duties. Agent Francisco testified that he feared that the Defendant would have fled if he did not arrest her when he did. Agent Francisco related that he never threatened the Defendant, never drew his weapon, never raised his voice, did not struggle with her physically, and that he never had direct contact with the Defendant while she remained inside her home. Agent Francisco further testified that the Defendant was "understandably" visibly upset that she was being arrested and that she cried "periodically" [Doc. 45 at 22-23]. He further stated that she was coherent, that she did not appear intoxicated, and that she appeared to understand what was occurring. Agent Francisco described the entire incident as having been "very calm" and having occurred with "absolutely no" incident [Id. at 23].

6

Agent Francisco handcuffed the Defendant and put her in the back of his truck for transport to the Knoxville ICE office. Agent Francisco did not advise the Defendant of her Miranda rights because he "had no intention of asking her any questions" and because it was an administrative arrest, rather than a criminal arrest [Doc. 45 at 23-24]. He related that it was not his case and that he required no further information from the Defendant other than her identity, which he had already obtained. Agent Francisco testified that he did not interrogate the Defendant on the way back to the office but that he did have a small talk conversation with her. He stated that she told him that she had changed her life and that "they were doing . . . the right things for their children" [Id. at 24]. Agent Francisco testified that the Defendant did not say anything incriminating on the ride to the office.

When Agent Francisco arrived at the office, he took the Defendant to the ERO holding area, removed her handcuffs, and put her in a holding cell. He had no further involvement with the Defendant after that point.

On cross-examination, Agent Francisco testified that while there were automobiles parked at two residences next door to each other, the truck that was registered to the Defendant, the tag of which was visible as the agent drove by, was clearly parked in the driveway in front of her home. Agent Francisco testified that he originally went to the Defendant's home because he received information from the ERO agent in charge of the operation that her's was an address of interest and because he was requested to go to it. Agent Francisco testified that he does not know how the ERO officers obtained information about the Defendant's whereabouts. Agent Francisco had never spoken with the Defendant prior to May 17, 2011, but he had seen a photograph of her that morning.

Agent Francisco testified that Jonathan Barnes is an ERO officer who was present at the

scene at the start but departed after the officers knocked on the door and no one answered.  Officer

Barnes was not present when the Defendant came out of the home or when Agent Francisco initially

questioned the Defendant.  Agent Francisco confirmed that neither he nor anyone else advised the

Defendant of her Miranda rights when she exited the house, and he stated that the Defendant told

him that she was in the United States illegally when she came out.  The agent also stated that he is

aware that the report of Officer Barnes stated that the Defendant was arrested outside of her

residence, and he confirmed that the agents were present to arrest her.

Agent Francisco did not know who was present in the Defendant's home until the children

came out of the house.  The Defendant has four young children.  When questioned with regard to the

automobiles, Agent Francisco testified that he did not recall how many were at the house that

morning but that he thinks there were two there the day before.[2]  Agent Francisco testified that after

speaking with Adrian Kincaid, he knew that Mr. Kincaid was the father of two of the Defendant's

children and that the Defendant was living in close proximity to her family, including Mr. Kincaid

and her children's grandparents.  Agent Francisco did not have any information that the Defendant

specifically would attempt to flee.

In responding to inquiry about the locations of the officers when they first approached the

Defendant's house, prior to having spoken with Mr. Kincaid, Agent Francisco explained that he was

at the front of the house, another agent was at a side door of the house, and several other agents stood

in the yard close to the road so that they could watch to see the other side of the house as well.

Agent Francisco reiterated that during the ride from her home to the office, the Defendant told him

_____

[2]Other than this brief statement, the Court heard no testimony indicating that Agent
Francisco was at the Defendant's house the day before she was arrested.

that "she had made some mistakes in the past," that "she had not been in trouble in quite some time," "that she was working helping other people" in a charity, and that she and her husband[3] were involved in their church [Doc. 45 at 35]. The agent related that he then told the Defendant that making a change in her life was good and that they continued to engage in small talk until they arrived at the office.

Agent Francisco did not prepare a report and has no notes related to the incident. Agent Francisco testified that while he was maintaining surveillance on the Defendant's home from approximately 200 yards away, the ERO officers had left the scene to head to another location and the other HSI agent was positioned less than 200 yards away in his vehicle on the other side of the road from the home. When Mr. Kincaid called the Defendant, the agents were standing next to him in the street in front of his house. Agent Francisco testified that the agents, Mr. Kincaid, and Mr. Kincaid's father walked toward the Defendant's house from Mr. Kincaid's house about a minute or two from the time when the agents told Mr. Kincaid that the children could exit the house and not be present when the Defendant was arrested. When the party arrived in front of the Defendant's home, Mr. Kincaid telephoned the Defendant again and informed her that they were ready for her exit.

When the Defendant came out of the house after the children left with Mr. Kincaid's father, Agent Francisco asked, "Are you Maria Rodriguez?," and the Defendant responded, "Yes" [Doc. 45 at 40]. Agent Francisco confirmed that the Defendant did not attempt to leave the house after Mr.

---

[3]The Court heard some conflicting testimony as to whether the Defendant and the father of her children, Mr. Kincaid, are presently married or if they are divorced. The Court finds this fact irrelevant for purposes of this motion.

Kincaid called her and informed her that ICE agents were present. When asked what he would have done if the Defendant exited the house and started walking away, Agent Francisco stated that because he had seen her photograph at that point and "recognized her as . . . strongly resembling the person" they were looking for, and because Mr. Kincaid had informed him that the Defendant was inside of the house, he would have placed her under arrest [Id. at 40-41]. Agent Francisco affirmed that the Defendant was not free to leave when she exited her home.

On redirect examination, Agent Francisco testified that he did not handcuff the Defendant when she first exited the house and that he did not interrogate her after he placed her in handcuffs. Agent Francisco testified that it is a criminal violation of federal law for an illegal alien to be present within the United States and that in addition to it being a criminal violation, being present in the United States as an illegal alien is also an administrative violation of immigration laws.

The Court then briefly questioned the witness, and he testified that the Defendant never verbally refused the agents entry into her home. Instead, she only failed to respond to the knocks on her door. Agent Francisco also testified that he never demanded that the Defendant come out of the house.

On re-cross-examination, Agent Francisco stated that Mr. Kincaid offered to call the Defendant after the agents explained to Mr. Kincaid that it would be best if the Defendant surrendered herself. The agents did not ask Mr. Kincaid to call the Defendant or to go inside of her house and get her to come out. Mr. Kincaid then relayed the information to the Defendant.

*(B) Testimony of Officer Jonathan Barnes*

Officer Jonathan Barnes works in the ERO facet of Knoxville ICE, primarily working in the processing and "sending . . . down the line" of illegal aliens for administrative removal from the United States [Doc. 45 at 45]. Ninety-five percent of Officer Barnes' job involves processing illegal aliens for administrative removal, while the other five percent involves dealing with illegal aliens who may have been deported previously and who could be prosecuted criminally. In describing the process of preparing an illegal alien for administrative removal, Officer Barnes testified that the individual's fingerprints are first run through the Integrated Automated Fingerprint Identification System ("IAFIS"), run by the Federal Bureau of Investigation ("FBI"), to determine the individual's identity. Once the officers have established an individual's identity, they interview the person and obtain personal information from them, and then begin the administrative paperwork necessary for removal.

As part of his administrative duties, Officer Barnes occasionally refers cases to the United States Attorney's Office for criminal prosecution. The United States Attorney's Office then prosecutes some of those case and declines to prosecute others. A case being referred for criminal prosecution does not automatically halt the administrative immigration removal process and in some cases, a person has already been administratively removed from the country by the time an indictment is returned against them.

Along with the fugitive operations team task force, Officer Barnes was asked to assist in the location of illegal aliens targeted for administrative removal. The Defendant was referred to the fugitive operations team by the FBI, as illegal aliens often are. The sole purpose of the ERO operation participated in by Officer Barnes was the administrative removal of the targets, rather than

11

arresting them for criminal violations. Officer Barnes arrived at the Defendant's house at approximately 6:00 a.m., on the morning of May 17, 2011. He did not know much about the Defendant prior to that day, other than the address of her residence and that she was the first target on the team's list for the day. Officer Barnes also had information that the Defendant had previously been deported. Officer Barnes testified that it is unlawful for a deported alien to return to the United States without the express permission of the United States Attorney General or the United States Secretary of Homeland Security.

Officer Barnes testified that five or six officers went to the Defendant's home and that two of the fugitive operations officers usually knock on the door of the house, while the others stand back with a view of the house in case anyone comes out. In this instance, no one answered the knocks on the Defendant's door. Officer Barnes testified that the officers knocked a few times to see if someone was asleep and would wake up, but no one answered. After some time of knocking with no answer, Officer Barnes left the location and went with other officers to the next target's house.

When Officer Barnes returned to the Knoxville ICE office later that morning, the Defendant was present at the office. Officer Barnes testified that the Defendant was there because, "I guess she was apprehended by the two officers that were left at her location. And she was brought there to be placed in the administrative removal proceedings" [Doc. 45 at 50]. Officer Barnes was assigned to process the Defendant, so he started the standard administrative paperwork. The officer explained that this process involves asking the individuals who they are and running their fingerprints in IAFIS to get an exact identification of who they are. Officer Barnes followed the same process in the Defendant's case that he does in all administrative immigration cases to which he is assigned.

One of the forms filled out by Officer Barnes in every case, also filled out in the Defendant's

case, is the "Record of Deportable/Inadmissible Alien" form [Exhibit 1 to the October 5, 2011 Hearing]. The forms are known as background biographical forms and include all biographical information about the individual being process, including her fingerprints, photograph, alien registration number, and date of birth. The second page of the form is a narrative filled out by the officer processing the individual, based upon the information the individual provides during processing. The second page is generally filled out without issuing Miranda warnings, and Officer Barnes did not advise the Defendant of her Miranda rights in this case prior to obtaining the biographical information on the form. Officer Barnes testified that he did not issue Miranda warnings to the Defendant at that point because "it's just nothing more than just an administrative removal case. It's not a criminal case" [Doc. 45 at 53-54].

When Officer Barnes noted that the Defendant's alien registration file showed that she had been deported previously as a convicted felon for an aggravated felony, the officer started viewing the Defendant's case as a possible criminal prosecution. Officer Barnes testified that, "I believe I read [the Defendant] her Miranda rights either right before or right after I called the U.S. Attorneys' [sic] Office to ask them if they would be interested in the case" [Id. at 54]. Officer Barnes does not recall what time he read the Defendant her rights, but he read them to her in English because she appeared to be "[v]ery fluent" [Id. at 55]. The Defendant asked no questions about her rights, expressed no confusion, and she signed a Miranda rights waiver form [Exhibit 2 to the October 5, 2011 Hearing]. Officer Barnes also provided the Defendant with a Miranda waiver form in Spanish, which she also signed [Exhibit 3 to the October 5, 2011 hearing]. The times on the forms indicate that the Defendant was taken into custody at 8:00 a.m., and signed the rights waiver form at 12:30 p.m. Officer Barnes testified that the Defendant appeared to have no difficulty reading or writing,

13

did not appear intoxicated, appeared coherent, did not appear sleep deprived, was not hysterical, was taking no medications, had no medical problems, and had been provided lunch at the ICE office. The Defendant informed Officer Barnes that she obtained a General Education Diploma ("GED") in California. The Defendant was not handcuffed while she answered questions with Officer Barnes, and he was the only officer speaking with her at that time. Officer Barnes testified that he never threatened or made promises to the Defendant before she signed her Miranda waiver. The Defendant never requested an attorney.

After having signed the Miranda waiver form, the Defendant made a statement [Exhibit 4 to the October 5, 2011 hearing], and Officer Barnes typed the sworn statement contemporaneously. After the Defendant reviewed the statement, both the Defendant and Officer Barnes signed the statement. Officer Barnes testified that it takes approximately five minutes to get through the statement form, which includes pre-typed questions asked of each individual. Officer Barnes does not believe that the Defendant was interviewed again, by him or any other agent, after he took her statement. After taking the statement, Officer Barnes called the U.S. Attorney's Office and got the process for prosecuting the Defendant started. Officer Barnes confirmed that the process for referring a case for criminal prosecution and the administrative immigration process move forward contemporaneously.

The Defendant was then transported to the ICE holding facility in Dekalb County, Alabama, as is every person being administratively removed from the country. After Officer Barnes made a copy of his file on the Defendant and sent it to the U.S. Attorney's Office, he appeared before the grand jury in Chattanooga, Tennessee, on May 24, 2011, and an indictment was returned. From the administrative removal side, after the indictment was returned, Officer Barnes had to "kind of stop

14

the administrative and start making arrangements for the Defendant to come back up towards Knoxville," to appear in federal court [Doc. 45 at 62-63]. If Officer Barnes had not halted the administrative process, the Defendant would have proceeded on the process for removal from the United States.

Officer Barnes identified Exhibit 5 as the "Notice to Appear, Bond, and Custody Processing Sheet," which evidences that the Defendant would have remained in immigration custody until removal because her's is a "reinstatement case" and would not have a bond attached [Id. at 63]. The officer further identified Exhibit 6 as an I-205 "Warrant of Removal/Deportation" form that is filled out and "execute[d] on the people that [ICE] deport[s]" [Id.].

On cross-examination, Officer Barnes testified that he had no contact with the Defendant at her home and that the first time he saw her was at the ICE office. Officer Barnes related that it is approximately a twenty to thirty minute drive from the Defendant's house in East Knoxville to the ICE office in West Knoxville. Office Barnes does not believe that the Defendant was still handcuffed when he returned to the ICE office and first saw her. In describing the Knoxville ICE office holding facility, Office Barnes testified that the office has three temporary detention cells with a bathroom and water fountain. The cells have windows and no bars on the doors, but the doors to the cells lock.

Officer Barnes does not recall the exact time when he returned to the ICE office, but he remembers that he went to the locations of at least one or two more "targets" before returning to the office. Discussing the I-213 form [Exhibit 1], Officer Barnes testified that the form is an administrative document that the officers fill out on every person processed at their office and that the form is "just biographical information on the person" [Doc. 45 at 67]. Officer Barnes obtained

15

the information necessary to fill out the form from the Defendant prior to having advised her of her Miranda rights.

The Miranda waiver form [Exhibit 2] states that the Defendant was taken into custody at 8:00 a.m., and Officer Barnes testified that he probably got that time from "Ted or John" [Id.]. Officer Barnes recalls that the officers and agents first arrived in the Defendant's neighborhood around 6:00 a.m., on May 17, 2011, and that the Defendant signed the waiver forms at 12:30 p.m. The I-213 form [Exhibit 1] indicates that the Defendant was allowed to make a telephone call to Mr. Kincaid at 10:55 a.m., and Officer Barnes was present during the duration of that call. Officer Barnes testified that allowing the individuals to make a telephone call is part of the administrative processing. Officer Barnes also testified that during administrative processing, he asked the Defendant who she is, where she is from, what country she is from, her date of birth, and if she has any immigration documents. When he was taking the sworn statement [Exhibit 4], Officer Barnes additionally asked the Defendant when she returned to the United States.

Exhibit 1 indicates that the Defendant "admitted illegal alienage and was arrested outside of her residence" [Doc. 45 at 70]. Officer Barnes testified that the arresting officer informed him that the Defendant admitted illegal alienage before she was taken to the ICE office, prior to her having been advised of her Miranda rights. When questioned about the Defendant's arrest, Officer Barnes stated: "Yes, she was placed under arrest, but you do have to remember it's an administrative arrest" [Id.]. When asked to identify the difference between an administrative arrest and a criminal arrest when an individual is handcuffed during both, Officer Barnes testified that he does not know the answer to distinguishing between the two. Officer Barnes testified that the reason an administrative arrest is called administrative is because the officers do not have a warrant to arrest the suspected

16

illegal aliens.  Officer Barnes admitted that he "guess[es]" that a reasonable person taken into custody and handcuffed would feel like they were under arrest [Id. at 71].

Officer Barnes has no notes from his conversations with the Defendant other than what is written on the forms made exhibits to the hearing.  Further going through sworn statement [Exhibit 4], Officer Barnes testified that he thinks that he pointed out the date the Defendant's appeal was dismissed by the Board of Immigration Appeals and that she believed it to be the right date.  Officer Barnes had found the date in ICE's file on the Defendant, and he had that information prior to his conversation with her.  Immediately after reading the Defendant her Miranda warnings and her signing the rights waiver form [Exhibit 2], Officer Barnes completed the Sworn Statement [Exhibit 4] with the Defendant.

Officer Barnes did not know and had never heard of the Defendant prior to May 17, 2011.  Officer Barnes testified that the process of finding the Defendant and processing her for removal began because the FBI referred the Defendant's name to the fugitive operations program of the ERO.[4]

On redirect examination, Officer Barnes explained that the biographical information listed on the I-213 form [Exhibit 1] is obtained in all administrative immigration proceedings and that every individual processed is asked the same questions as the Defendant was.  Officer Barnes handled this case in the same way that he handles all normal cases.  Officer Barnes testified that as an ICE officer, he is authorized to arrest people for being present in the United States both as an

---

[4]Officer Barnes works primarily with the ERO criminal alien program ("CAP"), dealing with illegal aliens who are detained in local jails.  The fugitive operations program deals with illegal aliens who are not jailed.

administrative matter and a criminal matter, and he reiterated that it is a violation of both immigration and criminal law for a previously deported illegal alien to be present in the United States without express permission.

## III. FINDINGS OF FACT

The Court finds the following facts to be relevant in addressing the issues presented: The FBI contacted the ERO department of the Knoxville ICE office and provided officers with information to the effect that the Defendant reentered the United States after having been deported previously. This information also included the Defendant's possible whereabouts. As part of a task force initiative to locate illegal aliens and process them for administrative removal, ERO officers and HSI agents located the Defendant's residence.

On May 17, 2011, at approximately 6:00 a.m., five or six ICE agents and officers arrived at 1618 Folsom Drive, and Agent Francisco ran a check on the license tag of a vehicle parked in front of the Defendant's house and determined that it was registered to her. Some of the officers knocked on the door of the Defendant's home, with a few positioned in front of the house and some on the side. Although the officers witnessed the blinds moving in the window and believed someone was present in the house, no one answered the door. At that point, all officers except for Agent Francisco and one other agent left the Defendant's street and proceeded to the location of the next targeted alien.

Agent Francisco and the other agent, in an effort to watch the Defendant's home and see if she would leave, positioned themselves in their vehicles several hundred yards from the Defendant's house, in either direction from it. While waiting and observing the scene, Agent Francisco's truck

18

was approached by Mr. Kincaid, the current or ex-husband of the Defendant, and Mr. Kincaid asked why the agent was positioned there. Agent Francisco lied and informed Mr. Kincaid that he was seeking a stolen vehicle. After Mr. Kincaid left and Agent Francisco described the encounter to the other agent, the other agent informed Agent Francisco that he believed the man to be Mr. Kincaid, based on a photograph and other information in the Defendant's ICE file.

The agents approached Mr. Kincaid outside of his house, a few houses down and across the street from the Defendant's house. Mr. Kincaid's father was also present. The agents admitted that they were in the neighborhood to apprehend the Defendant and take her back to the ICE office to inquire into her immigration status. The agents also informed Mr. Kincaid that it would be in the Defendant's best interest if she came out of the house and spoke with them because the agents planned to wait around until she came out. Mr. Kincaid then volunteered to telephone the Defendant and explain the situation to her. Mr. Kincaid called the Defendant and told her why the agents were there and that it would be best if she came out. The Defendant relayed to Mr. Kincaid that she did not want to be arrested in front of her children, who were present in the house with her, and the agents told Mr. Kincaid that they would allow the children to exist first.

Mr. Kincaid telephoned the Defendant again when the agents, together with Mr. Kincaid and his father, approached her house, and the children exited the house and left with Mr. Kincaid's father. The Defendant then existed the house and was not free to leave from then on. When she came out, Agent Francisco, who had previously seen her photograph, asked the Defendant if she was "Maria Rodriguez," and she confirmed that she was. The Defendant also admitted that she was present in the United States illegally. After the Defendant confirmed her identity, Agent Francisco informed her that he was placing her under arrest and was going to take her to the ICE office to ask

questions about her immigration status. The Defendant was placed in handcuffs at that point and transported to the ICE office in Agent Francisco's truck. On the way to the office, Agent Francisco and the Defendant had a conversation which produced no incriminating evidence.

When Officer Barnes returned to the ICE office later that morning, he started processing the Defendant for administrative removal by asking her questions and filling out biographical information on Exhibit 1. During this process, Officer Barnes entered the Defendant's fingerprints into IAFIS and positively identified her as Maria Ignacia Ravelo-Rodriguez, determining that she was deported as an aggravated felon in 1998. Officer Barnes did not issue Miranda warnings to the Defendant prior to questioning her to obtain the information contained in Exhibit 1 because at that point, he planned to process the Defendant for administrative removal and did not view the case as a criminal prosecution.

After Officer Barnes determined from the Defendant's alien registration file that she was previously deported for an aggravated felony, he began viewing her case as a possible criminal prosecution. Officer Barnes called the U.S. Attorney's Office to refer the case and advised the Defendant of her Miranda rights either just before or just after he called. The Defendant signed Miranda waiver forms in both English and Spanish [Exhibits 3 and 4] and never requested an attorney. After the Defendant signed the waiver forms, Officer Barnes completed the answers to pre-printed questions on a sworn statement form [Exhibit 4] with the Defendant, including when the Defendant was previously deported, when she reentered the United States, and that she has a fear of returning to Mexico.

20

## IV. ANALYSIS

In her motion [Doc. 26], the Defendant requests that all statements and any other evidence obtained be suppressed because she was improperly arrested when the federal law enforcement agents arrested her without probable cause or a warrant in violation of her Fourth Amendment rights, and immediately began questioning her prior to advising her of her <u>Miranda</u> rights, in violation of the Fifth Amendment. The Defendant further contends that she did not knowingly and intelligently waive her <u>Miranda</u> rights and that the waiver obtained by the Government was obtained as a result of the illegal, warrantless arrest of the Defendant. The Defendant also summarily argues that she was not taken before a federal magistrate prior to the questioning and that her statements were taken in an inherently coercive atmosphere, causing her will to be overborne and rendering her statements involuntary.

The Government responds [Doc. 35] that the agents and officers had probable cause to arrest the Defendant without a warrant in a public place. The Government further argues that the Defendant's detention did not violate Rule 5 of the Federal Rules of Criminal Procedure because the rule does not generally apply to illegal aliens held in civil detention, absent evidence of collusion between immigration officials and prosecutors, which is absent in this case. The Government also maintains that the Defendant was properly advised of her <u>Miranda</u> rights and that she voluntarily waived those rights, that the Defendant's statement was voluntarily given, and that the Defendant's identity and all other biographical information provided by the Defendant is not subject to suppression.

In the Defendant's post-hearing brief [Doc. 51], she refines her argument to include that an alien may only be arrested without a warrant under 8 U.S.C. § 1357(a)(2) if the immigration officer

has reason to believe that the alien is likely to escape before a warrant can be obtained, and that the agents in this case had no such information about the Defendant. The Defendant also argues that the officers effectively placed her under arrest while she remained in her home in violation of her Fourth Amendment rights, when they had Mr. Kincaid call her and coax her out. The Government contends [Doc. 52] that the officers properly effected an administrative arrest of the Defendant when Agent Francisco had probable cause to believe that the Defendant was illegally present in the United States and reasonably believed that the Defendant would attempt to flee the area if she was aware that ICE was obtaining a warrant for her arrest. Alternatively, the Government argues that even if Agent Francisco did not have probable cause to believe that the Defendant would have fled in the time it would have taken to obtain an arrest warrant, the exclusionary rule does not apply in this case.

*(A) Arrest of the Defendant*

*(1) Administrative Arrest*

The Defendant argues that she was placed under criminal arrest without probable cause or a warrant when she was informed that she was under arrest and was handcuffed outside of her house. An alien present in the United States, who was inadmissible when she entered, is deportable. 8 U.S.C. § 1227(a)(1)(A) & (B). "A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime." INS v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984). Pending a decision on whether the alien is to be removed from the country, agents may arrest or detain the individual "[o]n a warrant issued by the Attorney General." 8 U.S.C. § 1226(a). However, an ICE agent acting without a warrant has authorization:

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrestee shall be taken without unnecessary delay . . . before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a). Although the Sixth Circuit has not yet made a such a specific finding, the Court notes that, "[b]ecause the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause." United States v. Quintana, 623 F.3d 1237, 1239 (8th Cir. 2010) (citing Babula v. INS, 665 F.2d 293, 298 (3d Cir. 1981); Tejeda-Mata v. INS, 626 F.2d 721, 725 (9th Cir. 1980); United States v. Cantu, 519 F.2d 494, 496 (7th Cir.) cert. denied, 423 U.S. 1035 (1975); Au Yi Lau v. INS, 445 F.2d 217, 222 (D.C. Cir.), cert. denied, 404 U.S. 864 (1971); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975) (the Fourth Amendment, as construed in Terry v. Ohio, 392 U.S. 1 (1968), applies to warrantless seizures of aliens)).

The regulations contained in 8 C.F.R. § 287.8, on standards for enforcement activities, include the following with regard to immigration officers questioning and effecting arrests:

. . . .

(b) Interrogation and detention not amounting to arrest.

(1) Interrogation is questioning designed to elicit specific information. An immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.

(2) If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is . . . an alien illegally in the United States,

23

the immigration officer may briefly detain the person for questioning.

(3) Information obtained from this questioning may provide the basis for a subsequent arrest, which must be effected only by a designated immigration officer[.]
. . . .

(c) Conduct of arrests[.]
. . . .

(2) General procedures.

(i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.

(ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.
. . . .

(iv) With respect to an alien arrested and administratively charged with being in the United States in violation of law, the arresting officer shall adhere to the procedures set forth in 8 CFR 287.3 if the arrest is made without a warrant.

(v) With respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable . . . .

(vi) Every person arrested and charged with a criminal violation of the laws of the United States shall be brought without unnecessary delay before a United States magistrate judge [ ].  Accordingly, the immigration officer shall contact an Assistant United States Attorney to arrange for an initial appearance.

"The only evidence that the police must obtain in order for the government to prosecute someone who has committed [a violation of 8 U.S.C. § 1326] is the person's identity." United States v. Navarro-Diaz, 420 F.3d 581, 586 (6th Cir. 2005).  The ICE officers and agents, who went to the Defendant's house at 1618 Folsom Drive as part of a task force to locate and detain illegal aliens for

24

administrative removal from the United States, had information from the FBI which tipped them off to seek out the Defendant. Prior to encountering the Defendant directly, Agent Francisco checked the license tags in front of the Defendant's home and confirmed that one of the vehicles parked there was registered to the Defendant. The officers and agents had also seen a photograph and obtained some other limited information about the Defendant prior to the point at which they first encountered the Defendant. Although he did not testify as to how he knew or what specific information he had, Agent Francisco testified at the hearing that he was aware that the Defendant was present in the United States after having been deported previously.[5] Agent Francisco testified that an ERO officer informed him that ERO believed that the Defendant lived at 1618 Folsom, but he did not know how ERO came by that information. When the agents knocked on the door of the Defendant's house, they saw blinds moving inside, but no one answered.

Moreover, the agents obtained additional information about the Defendant and her presence in the house from Mr. Kincaid, her current or ex-husband. Mr. Kincaid confirmed to the agents that the Defendant was inside of the house at 1618 Folsom. Although Agent Francisco did not specifically testify that Mr. Kincaid stated that the Defendant was present in the country illegally, the agents informed Mr. Kincaid that the agents were from ICE and that they "were there to get [the

---

[5]The Court heard no testimony and was presented with no evidence to describe the information that initially led the ICE agents and officers to the Defendant's residence. The Court heard only that the Defendant's case was referred to ICE by the FBI and that the agents had in their possession a photograph of and other information related to the Defendant in an ERO file. Because the Defendant presented no evidence to rebut the reliability of the information relied on by the ICE agents and does not argue against its reliability, and because what initially led the agents to the Defendant's home does not control the Court's analysis given that the Defendant's identity is the primary proof necessary for a violation of § 1326, the Court has no reason to doubt the adequacy and reliability of the information which led ICE to the Defendant.

25

Defendant], that [they] had the paperwork to take her to the office to establish – to verify her status"
[Doc. 45 at 19]. With that information, Mr. Kincaid telephoned the Defendant and told her why the
agents were there and that it would be best for her to surrender herself. The Court notes that Mr.
Kincaid likely would not have called the Defendant and encouraged her to go with the ICE agents
if he was not aware that she was present in the country illegally. Moreover, Mr. Kincaid's lack of
protest to the agents as to the Defendant's illegality, taken together with the his comments to them,
further indicated to the agents that the Defendant was inside of the house and that she was in the
United States illegally.

The Defendant then came out of the house on her own free will. Agent Francisco testified
that the Defendant was not free to leave at that point and that he would have followed her and placed
her under administrative arrest if she tried to leave because he had seen her photo and identified her
as the person in the photo of a suspected illegal alien provided to him by the ERO officers, and
because Mr. Kincaid had confirmed that the Defendant, the individual he sought, was inside of the
house at 1618 Folsom. When the Defendant came out, Agent Francisco knew that it was her.
Accordingly, the Court finds that Agent Francisco had "reasonable suspicion, based on specific
articulable facts, that the" Defendant was "an alien illegally in the United States," and he could thus
"briefly detain [her] for questioning." See 8 C.F.R. § 287.8(b)(2).

The Court must now determine whether Agent Francisco acquired probable cause during his
brief encounter with the Defendant to take her into administrative custody as a deportable alien.
Though a Terry stop justified by reasonable suspicion of a criminal violation "can not continue for
an excessive period of time, or resemble a traditional arrest," Hiibel v. Sixth Judicial Dist. Court,
542 U.S. 177, 185-86 (2004) (citations omitted), this is not the case for detentions following

administrative arrests based upon probable cause that an alien is deportable, because detention while awaiting deportation proceedings is constitutionally valid. The Supreme Court has stated that "deportation proceedings would be [in] vain if those accused could not be held in custody pending the inquiry into their true character." Demore v. Kim, 538 U.S. 510, 523 (2003) (quotation omitted).

In accordance with the authorized brief questioning based upon reasonable suspicion, when the Defendant walked out of the house, Agent Francisco asked her if she was "Maria Rodriguez," and she confirmed that she was. Agent Francisco testified that he then told the Defendant that he was putting her under arrest and that he would take her to the ICE office to question her about her immigration status. The I-213 form [Exhibit 1], prepared later by Officer Barnes, states that the Defendant "admitted illegal alienage," and Agent Francisco testified that the Defendant told him outside of her house that she was present in the country illegally. At that point, after both confirming the Defendant's identity as the individual Agent Francisco had probable cause to believe was present in the country without authorization and hearing the Defendant admit that she is in fact in the country without authorization, Agent Francisco had sufficient reason to believe that the Defendant was present in the country illegally, or probable cause, to effect an administrative arrest of the Defendant. See 8 C.F.R. § 287.8(b)(3) and (c)(2)(i). Only after hearing the Defendant's response to his questioning, authorized by the Court's finding that he had reasonable suspicion to briefly detain the Defendant to inquire as to her status, did Agent Francisco inform the Defendant that she was under arrest and place her in handcuffs.

Having determined that Agent Francisco had probable cause to believe that the Defendant was present in the country without authorization both in violation of immigration and criminal laws, the Court must determine if it was proper for Agent Francisco to effect at administrative arrest of the

Defendant without first obtaining a warrant. To effect an administrative arrest without a warrant, in addition to needing reason to believe that an individual is present in the country illegally, the authorized arresting agent must also have reason to believe that the individual "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

In this case, the Defendant argues that Agent Francisco admitted that he had no information specific to the Defendant that she was likely to attempt to flee or escape. The Defendant asserts that the circumstances point toward the conclusion that the Defendant would not have attempted to flee because "[h]er four children were in the house with her, she had been living in that house for some time, and the grandparents of the children lived right next door" [Doc. 51 at 10]. The Government responds that Agent Francisco did have reason to believe that the Defendant would have fled if the agents left the scene to obtain a warrant for her administrative or criminal arrest, particularly in this case, after the agents' presence and purpose had been made known to the Defendant, first through the multiple knocks on her door, and then through the telephone call to her from Mr. Kincaid. Moreover, the Government contends that it was "certainly reasonable" for Agent Francisco, as an experienced ICE agent, "to believe that a previously deported alien would attempt to leave the area if she knew ICE was in the process of obtaining a warrant and would be returning shortly to arrest her and remove her from the United States" [Doc. 52 at 3].

Applying that reasonable belief to this case, the Government argues that the fact that the Defendant did not answer the door after ICE agents knocked several times, despite the Defendant having been present inside the residence during the knocks, further shows that the Defendant did not intend to comply with the agents. In support of its argument, the Government cites Contreras v. United States, 672 F.3d 307, 309 (2d Cir. 1982) (finding the warrantless arrests of aliens by INS

28

officers valid when one admitted being in the country illegally and one acknowledged being from another country and attempted to evade custody, and asserting that the determination of likelihood of escape by the district court need not depend on the testimony of officers about their subjective beliefs).  The Contreras court further wrote, "when the alien's deportability is clear and undisputed, that circumstance alone may provide a sufficient basis for an [ICE] officer to believe that escape is likely before a warrant can be obtained."  Id.

In United States v. Harrison, 168 F.3d 483 (4th Cir. 1999) (unpublished), the Fourth Circuit addressed the findings in Contreras.  The Fourth Circuit stated that the Second Circuit's determination that an alien's deportability being clear and undisputed may provide sufficient basis to believe that escape before a warrant can be obtained is likely, does not "amount to a holding that in every case in which an alien is deportable an arrest can be made without a warrant."  Id. at 4.  This is because such a holding would be contrary to the statute itself, which requires a reasonable belief that the alien is likely to escape.  Id.  The Harrison court did, however, cite Contreras to support its statement that "a court examines the objective facts within the knowledge" of the agents in making a determination as to whether a warrantless administrative arrest was proper.

In this case, the Court has already determined that the agents obtained probable cause to arrest the Defendant at the point at which she confirmed her identity and admitted illegal alienage outside of her residence.  Despite the fact that the Court has no reason to question the strong evidence of the Defendant's illegality in this case, the Court need not address or adopt the finding in Contreras that strong evidence of deportability may be sufficient to support a finding of a

29

likelihood of escape for purposes of § 1357(a)(2), to find that the administrative arrest was proper in this case.

Examining the objective facts within the knowledge of the agents in the instant case, the Court first addresses the facts cited by the Defendant to support her argument that the situation was not one in which she was likely to flee or escape. First, the Court finds that Agent Francisco's statement that he had no specific information about the Defendant indicating that she would flee does not control, particularly in light of his testimony that he did not tell Mr. Kincaid the true nature of the agents' presence on Folsom Drive because he thought Mr. Kincaid may have been acquainted with the Defendant and may have tipped her off, allowing her to escape. The Court finds that the presence of the Defendant's children inside of the house with her does weigh in favor of a finding that she was not likely to flee. The Court notes though that Agent Francisco testified that he did not know for certain that the children were inside of the house until they existed just before the Defendant came out. Moreover, the Court does not find the arguments that the children's grandparents live on the same street and that the Defendant had lived in that house for "some time" to be persuasive. The Court heard no evidence of closeness between the Kincaids and the Defendant, and the Defendant's ex-husband's father actually has legal custody of the Defendant's children. Further, the Court heard no testimony to indicate that the Defendant lived at 1618 Folsom for a long period of time and certainly did not hear evidence that the agents were aware that she had lived on that street for any amount of time.

While the Court finds that it would be improper and contrary to the statutory intent of § 1357(a)(2) to allow for warrantless administrative arrests in every case involving a deportable alien, the objective facts in this case weigh in favor of a finding that the agents had reason to believe that

30

the Defendant was likely to escape before a warrant could be obtained for her arrest.  See 8 U.S.C.

§ 1357(a).  When the officers knocked on the Defendant's door for a lengthy period of time, she was

present inside of the house, yet did not answer the door, indicating evasive behavior.  Although

Agent Francisco could not have known for certain that the person moving the blinds inside of the

house at that point was the Defendant, he had reliable information that the Defendant lived in the

house, including his confirmation that one of the automobiles parked in front was registered to her.

Moreover, after the agents spoke with Mr. Kincaid, they knew that it was in fact the Defendant who

had been in the house.  Next, not only had the Defendant likely learned that ICE was at her home

from the agents' knocks on her door, but Mr. Kincaid specifically informed her by telephone that the

ICE agents were present in the neighborhood to bring her to their office and inquire into her

immigration status.  The Court finds that when he effected the administrative arrest of the Defendant

after she confirmed both her identity and her illegal presence in the country, Agent Francisco had

reason to believe that the Defendant would have been likely to escape if he left her at her residence

to go obtain a warrant prior to arresting her, given her evasive behavior in failing to answer the door,

her knowledge of the agents' purpose and presence, and that she would have known that ICE would

be returning to her home to arrest her in the near future.

Moreover, even if the Court had found that the agents did not properly effect a warrantless

administrative arrest of the Defendant in this case, our appellate court has held that the exclusionary

rule does not apply to violations of 8 U.S.C. § 1357(a).  United States v. Abdi, 463 F.3d 547, 555-56

(6th Cir. 2006) cert. denied, 127 S. Ct. 2910 (2007).  Because the court in Abdi determined that

suppression was not an available remedy for a violation of § 1357(a)(2), the Sixth Circuit stated that

it "need not consider whether the district court erred in its factual determination that Abdi was not

31

an 'escape risk[.]'" Id. at 549 n.1. Accordingly, even if the Court had found that the agents did not have reason to believe that the Defendant was an escape risk in this case, suppression would not be appropriate.

Despite the Court's finding that the ICE agents had probable cause sufficient to effect an administrative arrest, the Court's analysis of whether the Defendant's arrest was proper does not end there. "The authority granted to immigration officers is not unbounded, but is subject to the principles of the Fourth Amendment as it relates to searches and seizure." United States v. Rodriguez–Franco, 749 F.2d 1555, 1559 (11th Cir. 1985); see also Rajah v. Mukasey, 544 F.3d 427, 441 (2d Cir. 2008) (noting that the Fourth Amendment provides protection against gratuitous questioning related to a person's immigration status). In Abdi, after holding that suppression is not the proper remedy for a violation of 8 U.S.C. § 1357(a), the Sixth Circuit went on to analyze whether the defendant's arrest complied with the requirements of the Fourth Amendment. 463 F.3d at 557-59. As the Defendant points out in trying to distinguish her case from that of Abdi's, the Sixth Circuit in Abdi wrote that:

> Although we hold that application of the exclusionary rule is not appropriate for the Government's statutory violation of 8 U.S.C. § 1357 in this case, we emphasize that this decision is based on the specific facts before the court. Specifically, we note that the outcome would be different if the Government's warrantless arrest had not complied with the Fourth Amendment, as discussed [later in this] this opinion.

Id. at 557 n.13. The Defendant here relies on this statement by the Sixth Circuit, claiming that her case is different because her warrantless arrest was not reasonable and did not comply with the requirements for search and seizure under the Fourth Amendment. Accordingly, the Court now analyzes the reasonableness of the Defendant's detention and arrest under a Fourth Amendment framework.

32

*(2) Fourth Amendment*

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Not every contact between a police officer and a member of the public is a seizure. United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled. United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert. denied, 474 U.S. 851 (1985). Nor is there any Fourth Amendment implication before a defendant is stopped or searched. United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000).

The Court will now analyze whether the ICE agents had reasonable suspicion or probable cause sufficient under the Fourth Amendment to seize the Defendant when they did.

*(i) Timing of Seizure*

The test for when the individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990). As noted above, "[a]bsent coercive or intimidating behavior

33

which negates the reasonable belief that compliance is not compelled," an officer's request for identification or information is not a seizure. Collis, 766 F.2d at 221 (holding that officer's request that defendant accompany him to the baggage claim area to retrieve a driver's license was not a seizure). The Supreme Court has enumerated certain factors that can indicate a seizure:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

United States v. Mendenhall, 446 U.S. 544, 554 (1980); Smith 594 F.3d at 536.

In this case, the Court finds that the Defendant was seized when she exited her house, answered Agent Francisco's brief questions about her identity, and was handcuffed. Agent Francisco testified that the Defendant was not free to leave once she came out of the house because he had seen her photograph, confirmed that her automobile was parked in front of the house, and obtained additional information from Mr. Kincaid. Accordingly, the Court finds that the Defendant was seized when she exited her home and started her direct encounter with the agents.

The Court must next determine whether the seizure of the Defendant was a permissible one: whether the agents had either reasonable suspicion or probable cause to detain the Defendant.

*(ii) Permissibility of the Warrantless Encounter*

In her post-hearing brief, the Defendant attempts to analogize her case to that of United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984), and argues that she was effectively under arrest while she was still inside of her house. In Morgan, the Sixth Circuit affirmed the district court's grant of the defendant's suppression motion when it found that the defendant's Fourth Amendment

34

rights were violated when he was under arrest "as a practical matter" when nine police officers and several police cruisers surrounded the defendant's home, a cruiser blocked the defendant's car in the driveway, and the police called for the defendant to exit the house. 743 F.2d at 1164. The Defendant here argues that her Fourth Amendment rights were likewise violated when there were initially five or six officers surrounding the Defendant's residence, and one officer went to the front door, with another at the side door of her house. The Defendant contends that Agent Francisco requested that Mr. Kincaid call the Defendant to convey a message to her and that this action meant that "although, [Agent] Francisco did not physically enter her house, he nevertheless intruded into her home by his communications with her through Kincaid, communications which very clearly conveyed to her that she was not free to leave and she was, in effect, under arrest inside her home" [Doc. 51 at 9].

In its initial response, the Government argues that the Defendant's arrest outside of her home was proper under the Fourth Amendment because the Defendant was arrested in a public place with probable cause to believe that she had committed and was continuing to commit a violation of 8 U.S.C. § 1326. The Government contends that this probable cause was based on the Defendant's identity, which is the only evidence the Government must obtain to prosecute a defendant for a violation of § 1326. See Navarro-Diaz, 420 F.3d at 586. In its post-hearing brief, the Government points out that the Sixth Circuit in Abdi found "that the Fourth Amendment exclusionary rule did not apply because the ICE agents had probable cause to believe that the defendant had committed a criminal violation and the warrantless arrest occurred in public," rendering the arrest in compliance with the Fourth Amendment [Doc. 52 at 4]. The Government argues that this Court should make the same finding because Agent Francisco had probable cause to believe that the Defendant was in

35

violation of § 1326, a criminal statute, and to arrest the Defendant. The Government also asserts that the Defendant was arrested in public in front of her home and that only two agents, not armed with long guns or wearing raid gear, were present when she was arrested. In support of that assertion, the Government cites United States v. Thomas, 430 F.3d 274, 278 (6th Cir. 2005), in which the Sixth Circuit found no violation of the Fourth Amendment when two officers knocked on the defendant's door, asked him to come outside and talk with them, and arrested him without a warrant.

Here, the Court finds that at its inception, the encounter between the agents and the Defendant outside of her home was a brief investigatory detention. "Assessing whether an investigatory stop comported with the Fourth Amendment is a two step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. Id.

A police officer may briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and

36

either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397. The Court assesses the reasonableness of the officer's suspicion in light of the totality of the circumstances surrounding the stop. See United States v. Arvizu, 534 U.S. 266, 273 (2002); Martin, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274.

Viewing the totality of the circumstances in this case, the Court finds that the information in the ERO file in the possession of the agents prior to the start of the day on May 17, 2011, the confirmation of the registration of the Defendant's vehicle in front of her home, the moving blinds and failure to answer to the door when the agents knocked, and the conversation with Mr. Kincaid about the Defendant, all combined together to provide the agents with reasonable suspicion, at minimum, to believe that the Defendant was presently committing the crime of being present in the United States in violation of the law. Accordingly, the two HSI agents had an adequate basis to conduct a brief investigative detention to obtain further information about the suspected criminal activity.

The Defendant claims, however, that she was arrested without probable cause and that her Fourth Amendment rights were thus violated. "It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." Ingram v. City of Columbus, 185 F.3d 579, 592-93 (6th Cir. 1999) (internal citation omitted). An officer may reasonably effect a warrantless arrest under the Fourth

Amendment if the arrest is made in public, and probable cause exists to believe that a criminal violation has been or is currently being committed. Abdi, 463 F.3d at 557 (citing United States v. Watson, 423 U.S. 411, 417-424 (1976)). Accordingly, because the Defendant was placed under arrest without a warrant in a public place in front of her home,[6] the Court must now determine if, as the Government argues, Agent Francisco obtained probable cause to believe that the Defendant committed, and was continuing to commit, the crime of illegally reentering the country after having been deported previously, in violation of § 1326, when he placed the Defendant under administrative arrest.

As the Sixth Circuit found in Abdi, "it is constitutionally irrelevant that the ICE officers' reason for arresting [the Defendant] was their belief that [s]he was in violation of immigration laws, and not that [s]he was a felon." See 463 F.3d at 558. In this case, both Agent Francisco and Officer Barnes testified that the officers went to 1618 Folsom Drive on the morning of May 17, 2011, with the intention of locating aliens for processing for administrative removal. As stated above, the Sixth Circuit has provided that, "[t]he only evidence that the police must obtain in order for the government to prosecute someone who has committed this crime is the person's identity." Navarro-Diaz, 420 F.3d at 586. Agent Francisco testified that he had knowledge that the Defendant had been previously deported when he went to her residence and that he knew from documents previously

---

[6] The Court does not agree with the Defendant's argument that she was effectively placed under arrest when she remained in her home. The Court heard no evidence that the ICE agents had weapons drawn at any point or that they ordered her out of her home. On the contrary, Agent Francisco testified that the agents never instructed the Defendant to exit her home and that they had no direct contact with the Defendant until she exited the house. Moreover, despite the Defendant's contention that the agents ordered Mr. Kincaid to call the Defendant and tell her to come out, Agent Francisco's testimony was that Mr. Kincaid volunteered to call to avoid any complications.

provided to him that the Defendant an earlier drug conviction. The Court did not hear testimony and was presented with no evidence as to whether Agent Francisco was aware at that point that the Defendant's previous conviction was a felony. However, when Agent Francisco, with reasonable suspicion to believe that the Defendant was present in the country illegally, asked the Defendant to confirm her identity and she did so, and stated that she was present in the country illegally, Agent Francisco had probable cause to believe that the Defendant had violated and was continuing to violate § 1326, illegally reentry into the United States. See Navarro-Diaz, 420 F.3d at 586. At that point, the Defendant was placed under administrative arrest for a violation of immigration law in a public place,[7] while the officers had probable cause to arrest her for a criminal violation as well. Accordingly, the Court the Court finds that the Defendant's public warrantless arrest was not unreasonable under the Fourth Amendment.

In Abdi, after concluding that the defendant's warrantless public arrest did not violate the Fourth Amendment, the Sixth Circuit wrote that it "[t]herefore . . . h[e]ld that Abdi's constitutional rights were not implicated by his warrantless arrest and application of the exclusionary rule [wa]s in appropriate." 463 F.3d at 560. In accordance with Abdi, the Court now finds that the Defendant's constitutional rights were not implicated by her warrantless arrest in front of her home, and the application of the exclusionary rule is inappropriate in her case.

---

[7]While the Defendant challenges the point at which she was arrested, she makes no argument that the location of the administrative arrest, in front of her house, was not in "public." See Payton v. New York, 445 U.S. 573 (1980).

*(B) Statements*

The Fifth Amendment to the United States Constitution protects against a defendant being "compelled in any criminal case to be a witness against himself." U.S. Const. amend IV. In light of this protection, the Supreme Court of the United States has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). Thus, before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to questioning. Miranda, 384 U.S. at 479. "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

As an initial matter, the Court rejects the Defendant's contention that any statements that she made during her encounter with the ICE agents outside of her house on May 17, 2011, must be suppressed as the fruit of an illegal arrest. The Court has already found that the Defendant's arrest did not implicate or violate the Fourth Amendment and that application of the exclusionary rule is inappropriate in this case.

*(1) Miranda*

Even where the Court finds that the Defendant was in custody, the duty to warn under Miranda arises only where the defendant is subjected to "express questioning or its functional equivalent." United States v. Murphy, 107 F.3d 1199, 1204 (6th Cir. 1997) (quoting Rhode Island

40

v. Innis, 446 U.S. 291, 300 (1980)).  Thus, "where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of Miranda warnings."  Murphy, 107 F.3d at 1204 (citing United States v. Montano, 613 F.2d 147, 149 (6th Cir. 1980)).

The Defendant here argues that Agent Francisco interrogated her outside of her residence without advising her of her Miranda rights, in violation of the Fifth Amendment.  In this respect, the Defendant contends that the statements she made outside of her house should be suppressed and that any statements made after those unwarned statements should be suppressed as fruits of the poisonous tree, in accordance with Wong Sun v. United States, 371 U.S. 471 (1963).  The Defendant specifically singles out the statement in Officer Barnes' narrative on the second page of Exhibit 1, that the Defendant "admitted illegal alienage" to Agent Francisco [Doc. 51 at 11].  The Government maintains that the Defendant was advised of her Miranda rights and voluntary waived those rights prior to making an inculpatory statement.

The Court has already found that the Defendant was placed under administrative, rather than criminal, arrest for the purpose of civil deportation proceedings after she confirmed her identity outside of her house.  See 8 C.F.R. 287.8(b)(3).  It is irrelevant that the agents had probable cause to arrest the Defendant for a criminal violation at that point, given that both Agent Francisco and Officer Barnes maintained throughout their testimony that their purpose was to effect an administrative arrest.  In Lopez-Mendoza, the Supreme Court noted that "[c]onsistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing."  468 U.S. at 1038.  The Supreme Court specifically noted that "[t]he Courts of Appeals have held, for example that the absence of Miranda warnings does not render an

41

otherwise voluntary statement by [a defendant] inadmissible in a deportation case." Id. at 1039 (citing Navia-Duran v. INS, 568 F.2d 803, 808 (1st Cir. 1977); Avila-Gallegos v. INS, 525 F2d 666, 667 (2d Cir. 1975); Chavez-Raya v. INS, 519 F.2d 397, 399-401 (7th Cir. 1975)). Moreover, the Court has found that prior to Agent Francisco placing the Defendant under administrative arrest, he had reasonable suspicion to believe that she was illegally present in the country both in violation of immigration and criminal law, and was thus entitled to briefly detain her and ask questions inquiring into her identity and immigration status. See 8 C.F.R. 287.8(b)(2). Accordingly, the Defendant was not entitled to Miranda rights during her brief conversation with Agent Francisco, which was an investigatory detention for both immigration and Fourth Amendment purposes[8] and was prior to her having been placed under administrative arrest. Therefore, the Court finds that the statements made by the Defendant, including her confirming her name and admitting to being present in the country illegally, were not obtained in violation of the Fifth Amendment.

Further, once at the ICE office, Officer Barnes followed proper procedures for a civil deportation when he examined the Defendant to verify her identity and entered her fingerprints into the IAFIS system. See 8 C.F.R. § 241.8(a)(2). After a few hours of administrative custody, Officer Barnes gathered probable cause to believe that the Defendant was guilty of a criminal violation of 8 U.S.C. § 1326(b), and decided to refer her case for criminal prosecution. When Officer Barnes obtained the Defendant's alien file and saw that she had previously been deported based on an aggravated felony conviction, he contacted the United States Attorney's Office. At the point when Officer Barnes began viewing the Defendant's case as a possible criminal one, the Defendant was

---

[8]"The very nature of a Terry stop means that the detained individual is not free to leave during the investigation, yet is not entitled to Miranda rights. United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003) (citing Berkemer v. McCarty, 468 U.S. 420, 439–41 (1984)).

advised of her <u>Miranda</u> rights, as provided in 8 C.F.R. § 287.8(c)(2)(v).[9]  The Defendant signed

<u>Miranda</u> waivers in both English and Spanish [Exhibits 2 and 3], and she agreed to answer additional

questions and to provide the a sworn statement.  Accordingly, the sworn statement [Exhibit 4], and

the information therein, was properly obtained after the Defendant was advised of her rights at the

appropriate and necessary time, and waived those rights.

*(2) Voluntariness*

The Defendant's motion summarily argues that she did not make a knowing and intelligent

waiver of her <u>Miranda</u> rights prior to questioning due to her mental condition at the time, that any

waiver obtained was a result of the illegal and warrantless arrest, that her statements were not freely,

knowingly, and voluntarily given, and that her statements were made in an inherently coercive

atmosphere, overbearing her will and rendering her statements involuntary.  The Government

responds that the Defendant has put forth no evidence supporting any of these arguments and that

she does not specify why the atmosphere was coercive and further that no such factors exist in this

case.

The Court agrees with the Government that the Defendant put forth no evidence indicating

that the Defendant's statements were involuntarily made or that the atmosphere was at all coercive.

To the contrary, the Defendant was provided with, and acknowledged in writing, her <u>Miranda</u> rights

both in her native Spanish and in English, which she currently speaks.  Nothing about this case

---

[9] 8 C.F.R. § 287.8(c)(2)(v) provides: "With respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable . . . ."  In this case, the Defendant had not yet been placed under criminal arrest when Officer Barnes advised her of her rights.  Instead, he did so when he thought the case was likely to become a criminal one.

indicates that the Defendant's statements were anything but freely, voluntarily, and knowingly made, and the Court finds no merit to the Defendant's brief argument in this respect.

*(3) Biographical/Identity Information*

The Government argues that even if the Court finds that the Defendant's statements are subject to suppression in some other regard, the statements by the Defendant regarding her name, date and place of birth, and her citizenship are not subject to suppression because they fall under the umbrella of routine biographical information. In its post-hearing brief, the Government cites Navarro-Diaz, arguing that the Defendant's statements of her name and date of birth, as identity statements, cannot be suppressed. The Court of Appeals for the Sixth Circuit has previously held that "questions that are part of a routine procedure to secure biographical data to complete the booking process" are not interrogation for Miranda purposes. United States v. Avery, 717 F.2d 1020, 1024 (6th Cir. 1983). Officer Barnes testified that the information filled out on Exhibit 1 is all routine biographical information that is obtained from every individual being processed for administrative removal from the country. The information on this form includes the Defendant's fingerprints, photograph, alien registration number, and date of birth. The Court finds that the information on Exhibit 1, obtained prior to Officer Barnes viewing the Defendant's case as a criminal one and advising her of her Miranda rights, is primarily biographical information for the booking process at the start of civil deportation proceedings. Thus, the questions which gave rise to the responses on that form were not interrogation and the Defendant was not entitled to Miranda rights at that point. See Avery, 717 F.2d at 1024.

As to the Defendant's identity, in Navarro-Diaz, the Sixth Circuit discussed the Supreme Court's holding in Lopez-Mendoza:

44

In <u>Lopez-Mendoza</u>, the United States Supreme Court determined "whether an admission of unlawful presence in this country made subsequent to an allegedly unlawful arrest must be excluded as evidence in a civil deportation hearing." 468 U.S. 1032, 1034 (1984). The Supreme Court refused to suppress the alien's identity and held that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." <u>Id.</u> at 1039.

420 F.3d at 584. In this case, the Court has already found that the agents had reasonable suspicion to detain the Defendant, that she was not "accosted . . . at random," and that the agents had probable cause to arrest the Defendant. <u>See</u> <u>Navarro-Diaz</u>, 420 F.3d at 587. Accordingly, the Defendant was not the subject of an unlawful arrest in violation of the Fourth Amendment. However, assuming *arguendo* that she was, her identity, her name and date of birth, would not be subject to suppression.

The Court further notes, as the Sixth Circuit described in <u>Navarro-Diaz</u>, that:

Moreover, there is a significant practical problem with Navarro-Diaz's argument. Navarro-Diaz "is a person whose unregistered presence in this country, without more, constitutes a crime. His release within our borders would immediately subject him to criminal penalties." <u>See</u> <u>Lopez–Mendoza</u>, 468 U.S. at 1047, 104 S.Ct. 3479. If his "identity may be suppressed, the moment the court lets him go, he is immediately committing the continuing violation of being present in the United States after having been deported." <u>Del Toro Gudino</u>, 376 F.3d at 1001-02 ("Although the rule that identity evidence is not suppressible is not limited to § 1326 cases, its practical force is particularly great in this context."). The Supreme Court recognized this difficulty in <u>Lopez-Mendoza</u>, when it refused to suppress the alien's identity because, although "[t]he constable's blunder may allow the criminal to go free, . . . [the Court has] never suggested that it allows the criminal to continue the commission of an ongoing crime." 468 U.S. at 1047, 104 S.Ct. 3479 ("Even the objective of deterring Fourth Amendment violations should not require such a result.").

420 F.3d at 587. Just as in <u>Navarro-Diaz</u>, the Defendant here could simply be reindicted for the same offense," meaning that the suppression of her identity "would have little deterrent effect upon the [agents] who questioned h[er] during h[er] allegedly unlawful detention." <u>See</u> 420 F.3d at 588 (citing <u>United States v. Rodriguez-Arreola</u>, 270 F.3d 611, 619 (8th Cir. 2001) (stating that the

suppression of fingerprint evidence taken during an unlawful arrest would not "bar the present or future prosecution of [the defendant] under § 1326")).  Noting the lack of deterrent, the Navarro-Diaz court held that the defendant's motion to suppress identity must be denied, regardless of whether the identity information was obtained in violation of the defendant's Fourth Amendment rights. Id.

In sum, the Court recommends that all statements be deemed admissible for purposes of trial because: 1) the statements made in response to brief questions at the Defendant's home were during a brief investigatory detention and thus did not fall under Miranda; 2) the Defendant was the subject of civil deportation proceedings at least until Officer Barnes called and referred her case to the United States Attorney's Office, so she was not entitled to Miranda protections prior to that point, and statements made prior to then should thus not be suppressed; 3) statements providing the Defendant's biographical information made in response to administrative questions is not suppressible; 4) the Defendant's identity is not suppressible; and 5) the information on the sworn statement [Exhibit 4] was obtained after the Defendant knowingly and voluntarily waived her Miranda rights.


*(C) Rule 5(a)*

The Defendant's motion briefly argues that her rights were violated because she "was not immediately taken before a magistrate and advised of her rights prior to being questioned by law enforcement agents," and that her statements were taken in violation of Federal Rule of Criminal Procedure 5(a)(1)(A) [Doc. 26 at 1-2].  The Court heard no argument or evidence related to this contention at the hearing or in the Defendant's post-hearing brief.

46

Rule 5(a)(1)(A) provides, "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." The nature of arrests under § 1357(a)(2), for the purpose of deporting illegal aliens, as civil or administrative proceedings, leads to the finding that aliens held in that type of custody are not usually entitled to the protections of Rule 5(a). See United States v. Encarnacion, 239 F.3d 395, 398-99 (1st Cir. 2001). Detention awaiting deportation proceedings is constitutionally valid, and the Supreme Court has stated that "deportation proceedings would be [in] vain if those accused could not be held in custody pending the inquiry into their true character." Demore, 538 U.S. at 523 (quotation omitted).

In this case, the Government argues that no violation of Rule 5(a) occurred in this case because Defendant was initially detained by ICE for the purpose of administrative removal and not for criminal prosecution. The Sixth Circuit has explained that "Fed. R. Crim. P. 5(a) does not generally apply to aliens held in civil detention, absent evidence of collusion between immigration and prosecution authorities." United States v. Garcia-Echaverria, 374 F.3d 440, 451 (6th Cir. 2004). The Government also cites United States v. Dyer, 325 F.3d 464, 470 (3d Cir. 2003), "stating that 'since Dyer was under civil detention rather than criminal arrest, his claim that the government violated Fed. R. Crim. P. 5(a) by not bringing him before a [m]agistrate [j]udge within a reasonable time of his detention lacks merit'" [Doc. 52 at 5]. As the Government points out, the Defendant has put forth no evidence to indicate any collusion between the ICE authorities and the prosecution in this case.

The Government further cites 18 U.S.C. § 3501(c), and Corley v. United States, 556 U.S. 303 (2009), and argues that "[e]ven if a Rule 5(a) violation somehow occurred in this case, suppression

47

Rule 5(a)(1)(A) provides, "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." The nature of arrests under § 1357(a)(2), for the purpose of deporting illegal aliens, as civil or administrative proceedings, leads to the finding that aliens held in that type of custody are not usually entitled to the protections of Rule 5(a). See United States v. Encarnacion, 239 F.3d 395, 398-99 (1st Cir. 2001). Detention awaiting deportation proceedings is constitutionally valid, and the Supreme Court has stated that "deportation proceedings would be [in] vain if those accused could not be held in custody pending the inquiry into their true character." Demore, 538 U.S. at 523 (quotation omitted).

In this case, the Government argues that no violation of Rule 5(a) occurred in this case because Defendant was initially detained by ICE for the purpose of administrative removal and not for criminal prosecution. The Sixth Circuit has explained that "Fed. R. Crim. P. 5(a) does not generally apply to aliens held in civil detention, absent evidence of collusion between immigration and prosecution authorities." United States v. Garcia-Echaverria, 374 F.3d 440, 451 (6th Cir. 2004). The Government also cites United States v. Dyer, 325 F.3d 464, 470 (3d Cir. 2003), "stating that 'since Dyer was under civil detention rather than criminal arrest, his claim that the government violated Fed. R. Crim. P. 5(a) by not bringing him before a [m]agistrate [j]udge within a reasonable time of his detention lacks merit'" [Doc. 52 at 5]. As the Government points out, the Defendant has put forth no evidence to indicate any collusion between the ICE authorities and the prosecution in this case.

The Government further cites 18 U.S.C. § 3501(c), and Corley v. United States, 556 U.S. 303 (2009), and argues that "[e]ven if a Rule 5(a) violation somehow occurred in this case, suppression

47

of the statements made by Defendant would be improper under 18 U.S.C. § 3501(c) because the statements were made voluntarily and 'within six hours immediately following [her] arrest'" [Doc. 52 at 5-6]. The times on waiver forms [Exhibits 2 and 3] indicate that the Defendant's sworn statement was taken approximately four and one half hours after her arrest.

The Court finds that the ICE agents initially detained the Defendant after placing her under administrative, not criminal, arrest. The Defendant has put forth no evidence to show a violation of Rule 5(a) or collusion between the prosecutors and ICE agents in her case. Because the Defendant was being held in anticipation of civil proceedings, at least until Officer Barnes referred her case to the United States Attorney's Office and perhaps until the Indictment was returned against her, Rule 5(a) protections did not apply to the Defendant at the points when she made the statements at issue in this motion. The Court also notes that it has heard no argument that the Defendant was not properly taken before a magistrate judge after she was criminally charged.

48

## V.  CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the Defendant's statements.  For the reasons set forth herein, it is **RECOMMENDED** that the Motion to Suppress Evidence and Memorandum [Doc. 26] be **DENIED**.[10]

Respectfully submitted,

___s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge

---

[10]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).